IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:08CV270-W[1]-02
(3:04CR83-W)


RODDIE PHILLIP DUMAS, SR. )
    Petitioner, )
                 )
      v. )                 **ORDER**
                 )
UNITED STATES OF AMERICA, )
    Defendant. )
_____ )


**THIS MATTER** comes before the Court upon Petitioner's Motion
under 28 U.S.C. to Vacate, Set Aside, or Correct Sentence, filed
June 12, 2008. For the reasons stated herein, Petitioner's
Motion will summarily be <u>dismissed</u>.

## I.   <u>FACTUAL AND PROCEDURAL BACKGROUND</u>

Pertinent Court records reflect that on August 24, 2004, a
Superceding Bill of Indictment was filed charging Petitioner with
having possessed with intent to distribute five grams or more of
cocaine base, in violation of 21 U.S.C. §841 (Count One); having
used and carried a rifle and three shotguns during and in rela-
tion to a drug trafficking offense and, in furtherance of such
drug trafficking offense, having possessed such weapons, all in

_____

[1]Petitioner's criminal case originally was assigned to the Honorable H.
Brent McKnight, United States District Judge for the Western District of North
Carolina. In October 2004 when Judge McKnight became too ill to continue with
his duties, the case was reassigned to the Honorable William L. Osteen, United
States District Judge for the Middle District of North Carolina. However,
Judge Osteen, now is retired; consequently, Petitioner's Motion to Vacate has
been assigned to the undersigned judicial officer.

violation of 18 U.S.C. § 924(c)(1) (Count Two); having possessed five firearms and numerous rounds of ammunition after previously having been convicted of a felony offense, in violation of 18 U.S.C. § 922(g) (Count Three); having forcibly opposed, intimidated and interfered with a United States Postal Service employee who was engaged in his official duties, in violation of 18 U.S.C. § 111 (Count Four); and having conspired to possess with intent to distribute 50 grams or more of cocaine base and 500 grams or more of powder cocaine, all in violation of 21 U.S.C. § 846 (Count Five). (Case No. 3:04cr83, document # 14). The Indictment also included a section captioned as "Special Findings Sentencing Allegations," asserting that "(a) Dangerous weapons (including one or more firearms) were possessed during and in relation to the drug conspiracy alleged in Count Five and the substantive drug offense alleged in Count One. **In violation of USSG §2D1.1(b)(1)**; (b) A victim was killed under circumstances that would constitute murder under 18 U.S.C. § 1111, had such killing taken place within the territorial or maritime jurisdiction of the United States, in relation to Counts One and Five. **In violation of USSG §§ 2D1.1-(d)(1) and 2A1.1**." (Id. emphasis in original).

On September 21, 2004, trial counsel filed a Motion to Suppress the evidence seeking the exclusion of all of the evidence which was obtained from Petitioner's residence. (Id., document #

23). Trial counsel argued that the person from whom consent to enter the property was obtained -- Petitioner's girlfriend -- was a mere guest who lacked authority to give that consent and, in any event, she did not understand the consent form by which she authorized the entry. (Id.). On October 14, 2004, the Government filed a Response to Petitioner's Motion to Suppress asserting that the totality of the circumstances established that the entry of the officers into Petitioner's home was lawful and the evidence which was seized could be used at trial. (Id., document # 28).

On October 14, 2004, a Magistrate Judge held an evidentiary hearing on Petitioner's Motion and subsequently entered a Memorandum and Recommendation concluding that the Motion to Suppress should be denied. (Id., document # 33). In particular, the Magistrate Judge found that the officers testimony and the documentary evidence[2] all establish that Petitioner's girlfriend knowingly and freely gave her consent for the officers to enter and search the house; and that the officers reasonably relied upon her apparent authority to give that consent. (Id.). On October 22, 2004, trial counsel filed Objections to the Magistrate Judge's Memorandum and Recommendation. (Id., document # 38).

---

[2] The documentary evidence consists of a form captioned as "Consent To Search," signed by Petitioner's girlfriend and stating: "I, Crystal Smith, give the Charlotte-Mecklenburg Police Dept. permission to secure my residence at 2529 Brentwood Pl. and go on the property, house and building(s) and inside the vehicle(s)."

On November 1, 2004, the Court held a pre-trial hearing during which the Government made an oral motion to dismiss the conspiracy charge (Count Five) and the Court granted that motion. (Id., docket sheet entry of oral order entered November 1, 2004). The parties then selected a jury and the Court scheduled the trial for later in the month. (Id.).

On November 22, 2004, the Government filed an "Amended Notice Of Intention To Seek Enhanced Penalties Pursuant To Title 21 U.S.C. § 851" asserting that based upon Petitioner's May 1992 conviction for felony possession of cocaine, he was exposed to enhanced penalties if convicted on the federal charges. (Id., document # 44). Also on November 22, 2004, the Court held a hearing on Petitioner's objections to the Magistrate Judge's Memorandum and Recommendation. Upon its own review, the Court concluded that the Magistrate Judge's findings and conclusions properly were made; thus, the Court orally overruled Petitioner's objections and held that the evidence was admissible. (See Trial Tr. 16, November 29, 2005).[3]

After conferring with his attorney, Petitioner then advised that he wanted to tender guilty pleas to the drug and the felon-in-possession charges set forth in Counts One and Three. (Trial Tr. 19). However, Petitioner also requested a jury trial on the

---

[3]This transcript is fully captioned as "Transcript Of Arraignment, Plea and Trial Before The Honorable William L. Osteen United States District Judge."

§ 924(c) count and the charge that he interfered with the Postal
Employee as set out in Count Four. Id.

Therefore, the Court conducted a Plea and Rule 11 Hearing
during which it engaged Petitioner in its standard, lengthy
colloquy to ensure that his guilty pleas were being intelligently
and voluntarily tendered. In response to the Court's numerous
questions, Petitioner swore that he had spoken at length to his
attorney about his case; that counsel "definitely ha[d given him]
. . . straight answers to the questions [he] ha[d] asked"; and
that counsel had "been very diligent" in his representation of
Petitioner. (Trial Tr. 23-24).

Petitioner further swore that he understood the charges and
the elements which the Government would have had to prove, and
that he was facing a statutory minimum mandatory term of 10 years
up to life imprisonment on Count One and up to 10 years imprison-
ment on Count Three. (Trial Tr. 28-33). Petitioner stated that
he understood his right to proceed to trial on his charges, that
if he chose to proceed to trial he would enjoy certain constitu-
tional protections, and that if he pled guilty he would give up
those rights. (Trial Tr. 26-31). Petitioner also admitted that
he was guilty of the charges in Counts One and Three and no one
had done anything to make him change his mind and enter his
guilty pleas; that no one had made him any threats or promises to
induce his guilty pleas; that counsel had not told him anything

5

different from what he was being told by the Court; that counsel had advised him to truthfully answer the Court's questions; and that he did not have any questions about anything the Court had said or anything that had happened in his case. (Trial Tr. 27, 36-37). Accordingly, the Court determined that Petitioner's guilty pleas were knowingly and willingly made and accepted the pleas. (Trial Tr. 37-38).

Thereafter, the jury was empaneled and Petitioner's trial began. During its case-in-chief the Government presented evidence which tended to show that on April 16, 2004, a U.S. Postal Service employee was delivering mail on Petitioner's street. (Trial Tr. 62). While engaged in a conversation with one of Petitioner's neighbors, the two men heard the screams of a small child and began to search for the child. (Trial Tr. 62-64). The mail carrier then found a young boy being mauled by four Pit Bull dogs. (Trial Tr. 64-65). The mail carrier fought off the dogs as the neighbor called the police. (Trial Tr. 65).

Firefighters and paramedics were the first to minister to the child. (Trial Tr. 65-66). Initially, no one came out of the house; however, a firefighter observed a woman who periodically was looking out of the window of the residence. (Trial Tr. 91-92). Concerned that there may have been additional victims inside, the firefighter pounded on the door and identified himself. (Trial Tr. 92). When no one responded to his efforts, the

firefighter kicked in the door and entered the residence. (Trial Tr. 92). The firefighter then saw Petitioner, who initially appeared to be groggy, and a woman who later was identified as Petitioner's girlfriend. (Trial Tr. 94). In response to the firefighter's questions, Petitioner stated that the dogs belonged to him. (Trial Tr. 92). Petitioner's girlfriend came out of the residence and about five to ten minutes later, Petitioner came out. (Trial Tr. 67). Petitioner told the workers that the injured child was his son. (Trial Tr. 69-70).

The mail carrier then asked Petitioner if he had not heard his son's screams for help and called Petitioner stupid. (Trial Tr. 70). In response, Petitioner used profanity, made a gesture as if he were holding a gun and threatened to kill the mail carrier if he ever saw him again. (Trial Tr. 70 and 95). Subsequently, Petitioner was told that the mail carrier had just saved his son's life; however, Petitioner continued to say that he would kill the mail carrier if he saw him again in his neighborhood. (Trial Tr. 95-96).

Petitioner left the scene with police in order to be with his son at the hospital, but his girlfriend briefly remained at the residence. During that time the girlfriend gave police written consent to enter and search the residence. (Trial Tr.

103).[4]  When officers entered the residence, they detected the
odor of marijuana.  (Trial Tr. 107 and 119).  In addition, offi-
cers went into Petitioner's bedroom and discovered in plain view
some marijuana cigarette butts and a loaded shotgun. (Trial Tr.
122-24).  In the pockets of the armrest of Petitioner's chair,
officers also discovered two small plastic bags of marijuana.
(Trial Tr. 125-28).  Officers also observed a set of digital
scales, a floor safe with cocaine residue on top, hundreds of
rounds of ammunition and two more guns.  (Trial Tr. 129-33, 136
and 143).  The floor safe later was found to contain multiple
plastic bags holding approximately 38 grams of cocaine base, over
$3,500 in cash, pictures of Petitioner and other documents.
(Trial Tr. 146, 166-70 and 178).

The Government's evidence also showed that on the date of
the incident, Petitioner was at the Charlotte-Mecklenburg Law
Enforcement Center giving a statement concerning his son's attack
when officers questioned him about the items which were found in
his bedroom.  (Trial Tr. 158-61).  Petitioner admitted ownership
of the evidence, first telling officers that "You ain't getting
into **my safe**" and then stating, "Answer me this, how do you

---

[4] The officers who testified at trial about entering and searching the
residence did not testify about Petitioner's girlfriend having consented to
that entry likely because they were not the officers to whom consent actually
was given.  However, the record establishes that during the hearing on Peti-
tioner's motion to suppress, Officers Larry Beeman and Julius Mitchell
testified that the girlfriend, who told officers that she lived at the resi-
dence, had read and signed the Consent To Search form upon which they relied.
See Transcript of Suppression Hearing 13-15, November 30, 2005.

mother fuckers get off coming into **my house**, taking **my guns**, going into the arm pocket of **my chair** and pulling out **my weed** and all this because my son died?" (Trial Tr. 158-61, emphasis added).

Following the Government's evidentiary presentation, Petitioner's counsel made a motion to dismiss under Rule 29 of the Federal Rules of Criminal Procedure. (Trial Tr. 17). On Count Two, trial counsel argued that the Government had failed to show that Petitioner had used the subject firearms as protection, deterrence or to facilitate any drug trafficking activities; and on Count Four, he argued that the mail carrier was not engaged in his official duties at the time Petitioner threatened him. (Trial Tr. 217-19). The Court denied Petitioner's motion and explained to him his right to present his own testimony. (Trial Tr. 222-23). After being placed under oath, Petitioner told the Court that he and counsel had discussed those matters, he understood his rights as explained both by counsel and the Court and he did not want to testify. (Trial Tr. 223-27).

Thereafter, trial counsel renewed his motion to dismiss but the motion again was denied. (Trial Tr. 232-33). The jury then received instructions from the Court, deliberated over the charges and convicted Petitioner of both counts. (Case No. 3:04cr83, document # 47). Undaunted, trial counsel made a motion for a judgment notwithstanding the verdict but that also was denied.

9

(<u>Id</u>., docket sheet entry of oral order entered November 23, 2004).

On June 8, 2005, the Court held Petitioner's Sentencing Hearing. However, at the outset of that proceeding, trial counsel made an oral motion to withdraw as counsel on the ground that he and Petitioner were having disagreements which interfered with counsel's representation of him. (Sent'g. Tr. 5-6, filed April 5, 2006).[5] For his part, Petitioner told the Court that he and counsel had disagreed about which witnesses to call. More particularly, Petitioner said he disagreed with trial counsel's plan to call only Petitioner's mother as a witness because he also wanted to call his former and current girlfriends as witnesses. (Sent'g. Tr. 8-9). Petitioner further stated that he wanted to proceed <u>pro-se</u> with his attorney's assistance. (Sent'g. Tr. 16). However, Petitioner eventually stated that other than the disagreement about witnesses, he was satisfied with what his attorney had done for him. (Sent'g. Tr. 25). The Court denied counsel's motion to withdraw and instead agreed to allow Petitioner to proceed <u>pro-se</u> and present his three witnesses with counsel's assistance. (Sent'g. Tr. 33-34).

Petitioner's mother testified, in relevant part, that Petitioner and his deceased son had shared a good relation; that she had minimal interaction with Petitioner's Pitt Bull dogs;

---

[5]This transcript is simply captioned as "Sentencing Hearing."

that she considered two of the dogs as house pets; that she had
not feared the dogs; that her grandson had played with and fed
the dogs; that she had not feared for her grandson's safety with
the dogs; that her grandson had been taught not to interact with
the dogs without permission; that she had never seen Petitioner
training the dogs to fight or behave aggressively, beating or
otherwise abusing the dogs; that she had observed the dogs
interact with Petitioner's friends; and that she had no knowledge
of the dogs ever biting anyone else and did not consider them to
be vicious animals. (Sent'g. Tr. 35-38 and 40).

Petitioner's current girlfriend testified that he and his
son had enjoyed a good relationship; that she had spent a lot of
time with one of the dogs but only had been exposed to the others
for about three weeks; that she had never observed the dogs be-
having aggressively toward anyone; that she had seen Petitioner's
son play with the dogs and, although he did not appear to be
afraid of them, the son was not allowed around the dogs without
supervision; that she had not observed the dogs nip or bite
anyone; that she had not observed the Petitioner physically abuse
the dogs; and that she considered the dogs as house pets.
(Sent'g. Tr. 58-63).

However, on cross examination, Petitioner's girlfriend con-
ceded that during the few years that she had known Petitioner, he
had not held a regular job; that he had several guns in his home;

that she had smoked marijuana with Petitioner prior to the attack on his son and she knew that he had drugs at his home; and that she had seen marijuana at Petitioner's home on one or two other occasions. (Sent'g. Tr. 66 and 68-70).

Thereafter, Petitioner proffered a stipulation that, had she been called as a witness, his former girlfriend would have testified that she had resided with Petitioner and knew his dogs; and that she had cared for them, was not afraid of them and had not witnessed them behave aggressively toward anyone. (Sent'g. Tr. 82).

Following Petitioner's pro-se presentation, trial counsel advised the Court that he did not object to the initial findings in the Pre-Sentence Report, namely that Petitioner's Offense Level was 30 and his Criminal History Category was II; that when considering the statutes, his sentencing range was 120 to 135 months imprisonment on Counts I and III; that he was facing a statutory mandatory minimum consecutive term of 60 months imprisonment on Count III; and that he was facing up to 12 months imprisonment on Count IV. (Sent'g. Tr. 86-87). However, the Government advised that notwithstanding Petitioner's Guidelines ranges, it planned to seek an upward variance. (Sent'g. Tr. 88).

Defense counsel then argued that the death of Petitioner's son fit within the statistical norm for family pets attacking the children in their families; there was no evidence that the dogs

were vicious; that three of the four dogs had passed a veteri-
narian's test to determine whether they were adoptable after the
attack; and that the attack was not the result of negligence or
other unlawful conduct but was a tragic accident.  (Sent'g. Tr.
89-101).

The Government argued that the variance was appropriate
because Petitioner willfully had created a risk of harm for his
son and others, not just by having vicious dogs around to protect
his drug trafficking activities, but also by having his home
littered with hundreds of rounds of ammunition, loaded, unlocked
firearms and drugs which easily could have been ingested by his
son.  (Sent'g. Tr. 103-06).  In addition, the Government noted
that Petitioner's criminal history included convictions for
felony possession of cocaine, carrying a concealed weapon, as-
sault on a female and a dismissed charge of pointing a firearm at
a person; and that Petitioner had shown a pattern of returning
unlawful conduct even after his convictions and punishments.
(Sent'g Tr. 106-08).

For his part, Petitioner told the Court that he was remorse-
ful for his son's death.  (Sent'g. Tr. 109).  Petitioner also
told the Court that the guns belonged to his former girlfriend;
he denied that he had threatened to kill the mail carrier; he
stated that he appreciated the mail carrier's efforts to save his
son; he said that the dogs were house pets; and he argued that

the Government's claim that he had placed his child in harm's way was untrue. (Sent'g. Tr. 109-16 and 123).

Ultimately, the Court determined that Petitioner's girl-friend's testimony was not helpful and essentially was incredible. (Sent'g. Tr. 125). The Court also determined that Petitioner's drug use before the attack made him incapable of properly caring for his son. (Sent'g. Tr. 127). Thus, the Court found that an upward variance was appropriate. (Sent'g. Tr. 127-28).

Ultimately, the Court sentenced Petitioner to a term of 180 months imprisonment on Count One, a concurrent term of 120 months imprisonment on Count Three, a concurrent 12-month term on Count Four, and to a consecutive term of 60 months imprisonment on Count Two, for a total of 240 months imprisonment. (Case No. 3:04cr83, document # 50: Judgment). The Court stated that its sentence was based upon the evidence that Petitioner lived in a condition and situation:

> where drugs were bountiful, where guns were
> available, and as a matter of fact, drugs,
> that is, marijuana, was available, which a
> young child, an eight year old child or any
> other young child, could avail himself of
> . . . . The situation was such that this
> Defendant used drugs in his own home in
> proximity to the child, and that the atmos-
> phere created by the defendant's own doing
> was such that accidents could and were likely
> to happen. He had to be able to foresee that
> accidents, even not categorizing it as any-
> thing worse than that or more sinister than
> that, but given its best light, could, in

14

> fact, happen, and that he created a situation
> here such that the sentencing guidelines is
> not able to deal with in its limited area.
> The Court feels compelled to impose what it
> thinks is a reasonable sentence, which is
> outside the maximum allowed by sentencing
> guidelines.

(Sent'g. Tr. 131-32).

Petitioner timely appealed his case to the Fourth Circuit Court of Appeals. (Case No. 3:04cr83, document # 53: Notice of Appeal). On appeal, newly appointed appellate counsel argued that: (1) the search of Petitioner's home was illegal; (2) there was insufficient evidence to support his conviction under 18 U.S.C. § 924(c); and (3) his sentence is unreasonable. United States v. Dumas, 216 Fed. App'x 298, 299 (4th Cir. Feb. 7, 2007), cert. denied, 127 S.Ct 2963 (2007). Upon its review, however, the Circuit Court, determined that the signed consent form authorized the officers to go onto the property and once inside, they discovered the evidence of Petitioner's crimes in plain view. Id. at 299. The Court of Appeals also determined that the Government presented evidence that the loaded shotgun, which Petitioner possessed illegally, was located in close proximity to large amounts of cocaine and cash; and that such evidence, along with "other indicia of drug trafficking," was sufficient to support Petitioner's § 924(c) conviction. Id.

As to sentencing, the Circuit Court determined that this Court properly had considered all of the sentencing factors and

15

the statutory sentencing limits.  <u>Id</u>. at 300.  The Court of
Appeals found that this Court's extensive reasoning was tied to §
3553(a) and that this Court plausibly had justified the variance;
therefore, the variance was reasonable because it fell within the
statutory limits.  <u>Id</u>.  Accordingly, the appellate Court affirmed
Petitioner's convictions and sentences.  <u>Id</u>.

Now, Petitioner has returned to this Court on the instant
Motion to Vacate.  By his Motion, Petitioner rehashes his earlier
claim that the Government discovered the evidence of his crimes
pursuant to an illegal search in that it "exceeded the bounds of
the consent which [was] given."  Petitioner also claims that he
was subjected to ineffective assistance of counsel due to trial
counsel's "fail[ure] to procure a plea agreement on all counts
and advising [Petitioner] to proceed to trial in the face of
overwhelming evidence which caused Petitioner to loose (-3)
reduction for acceptance."[6]

## II.  <u>ANALYSIS</u>

1. <u>**This Court is authorized to promptly
   review and dismiss any § 2255 motion
   which does not contain a claim that
   entitles the petitioner to relief**</u>.

Pursuant to Rule 4(b) of the Rules Governing Section 2255
Proceedings, sentencing courts are directed to promptly examine

---

[6]Although this is the only ground which Petitioner's Motion to Vacate
identifies in support of his claim of ineffective assistance of counsel, his
"Supporting Memorandum" sets forth additional arguments which all will be
addressed by the Court.

16

motions to vacate, along with "any attached exhibits and the record of prior proceedings . . . " in order to determine whether the petitioner is entitled to any relief on the claims set forth therein.  In the event it is determined that the petitioner is not entitled to relief, the reviewing Court must dismiss the motion.

Following such directive, this Court carefully has reviewed Petitioner's Motion to Vacate and the pertinent record evidence. As hereafter explained, such review clearly establishes that Petitioner is not entitled to relief on either of his two claims.

### 2. <u>Petitioner's challenge to the admissibility of the evidence is barred</u>.

Petitioner's first claim alleges that the evidence of his crimes was illegally obtained and admitted into evidence because police officers gained consent to enter his property from a person who lacked authority to give it and, in any event, the officers exceeded the scope of that consent when they found the evidence.  (<u>See</u> Case 3:08cv270, document # 1-2: Supporting Memorandum For Motion To Vacate at 6).  As was previously noted, however, Petitioner's appeal unsuccessfully challenged the legality of the search on this very ground.  Indeed, the appellate Court flatly rejected Petitioner's claim of an unlawful search and seizure, and expressly found that the consent for officers to search his property was valid and the evidence of his crimes legally was discovered.  <u>Dumas</u>, 216 Fed. App'x at 299.

It is well settled that in the absence of a favorable, in-
tervening change in the law which can be applied on collateral
review, a petitioner simply is not free to re-litigate claims
which already were rejected on direct review.  <u>Davis v. United
States</u>, 417 U.S. 333, 342 (1974); <u>Boeckenhaupt v. United States</u>,
537 F.2d 1182 (4th Cir.), <u>cert. denied</u>, 429 U.S. 863 (1976).
Accordingly, to the extent that Petitioner is seeking to raise
this claim without directing the Court's attention to any inter-
vening change in law which authorizes him to do so, his claim
simply is barred.

### 3.  <u>Petitioner's claim of ineffective assis-<br>tance of counsel also is factually and/or<br>legally baseless</u>.

With respect to claims of ineffective assistance of counsel,
a petitioner must show that counsel's performance was constitu-
tionally deficient to the extent it fell below an objective
standard of reasonableness, <u>and</u> that he was prejudiced thereby.
<u>Strickland v. Washington</u>, 466 U.S. 668, 687-91 (1984).  In making
this determination, there is a strong presumption that counsel's
conduct was within the wide range of reasonable professional
assistance. <u>Id</u>. at 689; <u>see also</u> <u>Fields v. Attorney Gen. of Md.</u>,
956 F.2d 1290, 1297-99 (4th Cir. 1985); <u>Hutchins v. Garrison</u>, 724
F.2d 1425, 1430-31 (4th Cir. 1983); <u>and</u> <u>Marzullo v. Maryland</u>, 561
F.2d 540 (4th Cir. 1977).

Under these circumstances, a petitioner "bears the burden of

proving <u>Strickland</u> prejudice." <u>Fields</u>, 956 F.2d at 1297, <u>citing</u> <u>Hutchins</u>, 724 F.2d at 1430-31. If the petitioner fails to meet this burden, a "reviewing court need not consider the performance prong." <u>Fields</u>, 956 F.2d at 1290, <u>citing</u> <u>Strickland</u>, 466 U.S. at 697. Further, in considering the prejudice prong of the analysis, the Court must not grant relief solely because a petitioner can show that, but for counsel's performance, the outcome of the proceeding would have been different. <u>Sexton v. French</u>, 163 F.3d 874, 882 (4th Cir. 1998). Rather, the Court "can only grant relief under. . . <u>Strickland</u> if the 'result of the proceeding was fundamentally unfair or unreliable.'" <u>Id</u>., <u>quoting</u> <u>Lockhart v.</u> <u>Fretwell</u>, 506 U.S. 364, 369 (1993).

Turning to Petitioner's second claim, here he first argues that trial counsel was ineffective for having failed to "procure a plea agreement on all counts and advising Movant to proceed to trial in the face of overwhelming evidence which caused Movant to lose (-3) point reduction for acceptance of responsibility. Ironically, however, Petitioner subsequently asserts in his Memorandum that counsel was ineffective for having advised him to plead guilty and that his guilty plea was not voluntary but the result of that ineffectiveness.

While Petitioner's actual position is not clear entirely, the record of this matter makes it plain that he cannot prevail in this regard. To be sure, to the extent that Petitioner is

claiming that counsel should have negotiated a global plea agreement, he cannot establish any prejudice.  To put it simply, there is no legal entitlement to a plea agreement; therefore, even if defense counsel had pursued a global agreement, there is no guarantee he would have secured one because the Government is not obligated to enter into such an arrangement with defendants. Moreover, this argument is further undermined by the fact that Petitioner could have entered "straight-up" guilty pleas to all of the charges and secured the three-level reduction without having obtained a formal plea agreement from the Government. Consequently, even if the Court accepts the argument that counsel should have sought a global agreement, Petitioner cannot show that counsel's failure in that regard cost him the three-level reduction.

To the extent that Petitioner also is asserting, in the alternative, that counsel somehow forced him to plead guilty and was ineffective for having allowed him to do so, the record belies this assertion.  Indeed, as was previously noted, the transcript from Petitioner's pre-trial proceedings shows that during his Plea and Rule 11 hearing, the Court went to great lengths to ensure that he was freely and knowingly entering his guilty pleas.  That is, Petitioner swore to a number of matters, including that he understood his right to proceed to trial.

In fact, when Petitioner answered evasively after having

been asked whether he wanted to plead guilty to charges which exposed him to a minimum of 10 years up to life imprisonment, the Court probed his answers to ensure he was acting of his own volition. (Trial Tr. at 36). At that point, Petitioner again confessed that he was guilty of the charges; that no one had done anything to make him change his mind and enter his guilty pleas; and that no one had tried to induce his pleas. (Trial Tr. 37-38).

The law is clear that in evaluating a post-guilty plea claim of ineffective assistance of counsel, statements previously made under oath affirming satisfaction with counsel, such as those made by Petitioner here at his Rule 11 hearing, are binding absent "clear and convincing evidence to the contrary." Fields, at 1299, citing Blackledge v. Allison, 431 U.S. 63, 74-75 (1977)); accord United States v. Lemaster, 403 F.3d 216, 220-23 (4th Cir. 2005) (affirming summary dismissal of §2255 motion, including ineffective assistance claim, noting inconsistent statements made during Rule 11 hearing). In the instant case, Petitioner has failed to allege the existence of any extrinsic evidence which could undermine his earlier sworn statements affirming the voluntariness of his guilty pleas. Therefore, this claim must be flatly rejected.

Turning to his Memorandum, Petitioner's curiously alleges that "had the Court, the Prosecutor or Defense Counsel informed

[him] that his sentence would be over 180 months, [he] would have pled not guilty and insisted on going to trial on all counts." However, the record of Petitioner's case also belies this contention. When Petitioner was arraigned on the charges on May 17, 2004, he was advised of all the charges and the statutory penalties which included a maximum term of life imprisonment. (See Case No. 3:04cr83, document # 10: Arraignment Order).

Furthermore, during his Plea hearing, the Court again re-minded Petitioner that he was facing a minimum of 10 years for his guilty plea on just Count One and that, notwithstanding his recommended Guidelines term, the Court could impose a more severe term of imprisonment up to a life term. (Trial Tr. 33). Peti-tioner then confirmed that counsel had advised him of those matters. (Trial Tr. 33). Thus, given the foregoing evidence, it goes without saying that Petitioner's belated, factually baseless allegation falls far short of stating a constitutional claim for relief.

Petitioner also contends that he was subjected to ineffec-tive assistance of counsel because "[c]ounsel requested to be removed as [Petitioner's c]ounsel, due to disagreements relating to [Petitioner's] position on how to proceed." (Case 3:08cv270, document # 1-2 at 9). However, as the Court already indicated, trial counsel revealed the disagreement and, after discussing the matter with the Court, Petitioner indicated that he wanted to

proceed with counsel.    (Trial Tr. 3-16).   Indeed, Petitioner
agreed to proceed with his attorney on the conditions that he be
allowed to present the additional witnesses and counsel be
available to assist with his presentation.   (Trial Tr. 17).
Petitioner then presented the information he desired after which
time trial counsel resumed his role of representing Petitioner.
As such, Petitioner was allowed to proceed exactly as he had
desired.   Equally critically, Petitioner does not point to a
single matter which he was unable to present as a result of his
arrangement.   Therefore, Petitioner has failed to allege facts
which could establish that he was prejudiced.

     In addition, Petitioner claims that counsel failed to inves-
tigate the search of his home and to challenge the fact that
neither he nor his girlfriend were present when the police went
onto his property following the attack of his son.   However,
Petitioner has not pointed to any evidence he believes counsel
would have discovered upon additional investigation.   Nor does
Petitioner claim that police refused to allow his girlfriend --
the person who was aware of and consented to the search -- to be
present when they searched the home.   Petitioner also does not
deny that the evidence of his criminal conduct was discovered in
plain view.   Consequently, Petitioner has failed to state a claim
for relief.   To put it another way, Petitioner's claim is doomed
because he does not explain how his girlfriend's presence would

have made a difference in the discovery of the evidence and he does not identify any exculpatory evidence that counsel could have obtained through further investigation.

Petitioner also complains that counsel was ineffective for first having failed to obtain independent laboratory testing of the drugs and then for having stipulated to their authenticity without explaining to Petitioner the significance of such stipulation. However, Petitioner does not even suggest that the white powdery substances which were seized were not cocaine base. Furthermore, the record evidence tends to suggest that had counsel attempted to challenge the authenticity of the drugs, his efforts would have been futile as the Government easily would have been able to call the appropriate witnesses to introduce their laboratory findings concerning the drugs' authenticity. Therefore, Petitioner cannot any prejudice on this claim.

Finally, Petitioner argues that trial counsel was ineffective for having failed to present a defense at trial. More particularly, Petitioner complains that counsel failed to call any witnesses in his defense. Notably, however, Petitioner does not point to a single person who could have been called to rebut his own pre-trial admissions or the Government's evidentiary strong presentation. As such, Petitioner cannot state a claim for relief on this allegation.

### III.  CONCLUSION

Petitioner's first claim is barred and his allegations against counsel are conclusory, factually and/or legally base-less.  Accordingly, Petitioner has failed to state a claim for relief.

### VI. ORDER

**NOW, THEREFORE, IT IS HEREBY ORDERED:**

1.  That Petitioner's Motion to Vacate is **DENIED and DISMISSED.**

**SO ORDERED.**

Signed: August 8, 2008

Frank D. Whitney
United States District Judge